**OUTTEN & GOLDEN LLP**
Cara E. Greene
Kathleen Peratis
Shirley Lin
3 Park Avenue, 29th Floor
New York, New York 10016
(212) 245-1000

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LISA LEE,<br><br>Plaintiff,<br><br>v.<br><br>CVC CAPITAL PARTNERS (U.S.), INC., CVC CAPITAL PARTNERS ADVISORY (U.S.), INC., CVC NOMINEES LIMITED, CVC INVESTMENTS S.A.R.L, and CVC CAPITAL PARTNERS SICAV-FIS S.A.,<br><br>Defendants. | **COMPLAINT**<br><br>**<u>Demand for Trial by Jury</u>** |

## NATURE OF THE ACTION

1. Lisa Lee ("Ms. Lee"), Plaintiff, brings this action against Defendants CVC Capital Partners (U.S.), Inc., CVC Capital Partners Advisory (U.S.), Inc., CVC Nominees Limited, CVC Investments S.A.R.L, and CVC Capital Partners SICAV-FIS S.A. (collectively, "CVC," "Defendants," or "the Firm"), for violations of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* (the "FMLA"), the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*, New York contract law, and the New York Labor Law ("NYLL").

2. Ms. Lee worked as a Managing Director in the New York office of Defendant CVC Capital Partners (U.S.), Inc. until Defendants terminated her employment after she reported

sex-based discrimination within the Firm. During the course of her employment, CVC discriminated against Ms. Lee by subjecting her to unwanted physical contact and to demeaning and denigrating comments from male supervisors and coworkers. In addition, despite her qualifications and excellent track record, as evidenced by her performance reviews, CVC denied Ms. Lee promotions and professional opportunities that it gave to her male colleagues. Furthermore, when Ms. Lee took maternity leave in 2012 for the birth of twins, the Firm attempted to strip her of her accounts and redistribute them to her male colleagues.

3. CVC holds itself out as one of the world's leading private equity and investment advisory firms, with a presence throughout Europe, the U.S., and Asia. Over its history, CVC has secured commitments of more than $79 billion for its private equity and credit vehicles, and is one of the largest private equity firms in the world.

4. At all times relevant to this action, Defendants fostered an environment that disfavors female employees and engaged in discriminatory procedures in selecting individuals for promotion. Out of approximately 24 Managing Directors and 13 Senior Managing Directors in its Private Equity divisions globally, Ms. Lee was the only female business-side Managing Director at the time CVC terminated her employment.

5. Since CVC terminated Ms. Lee's employment on February 23, 2015, CVC has not had any female business-side Managing Directors within its Private Equity divisions worldwide.

6. At the highest levels of CVC's leadership – the approximately 17 Managing Partners, 24 Partners, and 13 Senior Managing Directors who currently run the Firm's Private Equity divisions globally – there are no women among CVC's approximately 54 business-side leaders.

7. Racial minorities are severely underrepresented among CVC's leadership. Out of a total of 47 Managing Partners, Partners, and Senior Managing Directors performing Private Equity work within CVC's European and U.S. offices, only four are not white. At the highest level of management, among approximately 35 Managing Partners and Partners, only one individual, a male, is not white.

8. Throughout 2014, Ms. Lee made repeated complaints to CVC about the discrimination she and other women faced at the Firm. On January 19, 2015, Ms. Lee complained in writing about the systemic gender discrimination she faced at CVC. The next day, CVC told Ms. Lee that it would be ending her employment because "it was not working out." Defendants purportedly "restructured" Ms. Lee's role and terminated her employment on February 23, 2015, resulting in Ms. Lee's involuntary forfeiture of millions of dollars in deferred compensation and other equity she had earned.

9. Ms. Lee now brings this action seeking declaratory relief, actual damages, compensatory damages, liquidated damages, punitive damages, interest, attorneys' fees and costs, and other appropriate legal and equitable relief pursuant to the NYCHRL, the FMLA, and the NYLL.

**JURISDICTION AND VENUE**

10. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

11. This Court has subject matter jurisdiction over Ms. Lee's Family and Medical Leave Act claim pursuant to 28 U.S.C. § 1331.

12. This Court has supplemental jurisdiction over Ms. Lee's related claims under New York contract law and under the NYLL pursuant to 28 U.S.C. § 1367(a).

13. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions given rights to this action, including the unlawful employment practices alleged herein, occurred within the Southern District of New York.

## PARTIES

**Lisa Lee**

14. Plaintiff Lisa Lee is a 42-year-old Asian American woman.

15. Ms. Lee currently resides in Middlesex County, in the State of New Jersey.

16. Ms. Lee was employed in CVC's New York office as of October 2009 as a Director of Investor Relations, a partnership-track position.

17. By the time she was hired by the Firm, she had a successful professional record, having worked for 12 years at Merrill Lynch, Goldman Sachs, and AT Kearney.

**CVC Capital Partners (U.S.), Inc.**

18. Defendant CVC Capital Partners (U.S.), Inc. ("CVC (U.S.)"), is a Delaware corporation doing business within New York County in the State of New York and maintains corporate headquarters within the City and County of New York at 712 Fifth Avenue, New York, New York 10019.

19. During all relevant times, Defendant CVC (U.S.) was Ms. Lee's employer within the meaning of all applicable statutes.

20. Upon information and belief, after April 2012, Defendant CVC (U.S.) employed more than 50 people at its New York office. Prior to April 2012, CVC (U.S.) employed at least four employees.

21. During all relevant times, CVC (U.S.) did not maintain a Human Resources office within the United States and did not have a viable means for employees within the United States to report incidents of discrimination or harassment internally.

**CVC Capital Partners Advisory (U.S.), Inc.**

22. CVC Capital Partners Advisory (U.S.), Inc. ("CVC Advisory (U.S.)"), is a Delaware corporation doing business within New York County in the State of New York and maintains a principal office within the City and County of New York at 712 Fifth Avenue, New York, New York 10019.

23. CVC Advisory (U.S.) is the investment arm of Defendant CVC Capital Partners SICAV-FIS S.A.'s U.S. operations and is registered as an investment adviser firm with the U.S. Securities and Exchange Commission.

24. During all relevant times, Defendant CVC Advisory (U.S.) was Ms. Lee's employer within the meaning of all applicable statutes.

25. Upon information and belief, after April 2012, Defendant CVC Advisory (U.S.) employed more than 50 people at its New York office. Prior to April 2012, CVC Advisory (U.S.) employed at least four employees.

**CVC Nominees Limited**

26. Defendant CVC Nominees Limited is a company incorporated in Jersey (the Channel Islands) with its registered office at 1 Waverley Place, Union Street, Saint Helier, Jersey, JE1 1SG.

27. Defendant CVC Nominees Limited is the nominee for the Shareholders, who own shares issued by CVC Capital Partners SICAV-FIS S.A. and are registered in the name of CVC Nominees Limited. The Shareholders are CVC employees or former employees.

28. During all relevant times, Defendant CVC Nominees Limited was Ms. Lee's employer within the meaning of all applicable statutes.

**CVC Investments S.A.R.L.**

29. CVC Investments S.A.R.L. is a *société à responsabilité limitée* registered with Luxembourg with its registered office at 20, Avenue Monterey, L-2163 Luxembourg.

30. During all relevant times, Defendant CVC Investments S.A.R.L. was Ms. Lee's employer within the meaning of all applicable statutes.

**CVC Capital Partners SICAV-FIS S.A.**

31. Defendant CVC Capital Partners SICAV-FIS S.A. ("CVC SICAV-FIS") is a *société anonyme* registered with Luxembourg as a specialized investment fund and advisory company at 20, Avenue Monterey, L-2163 Luxembourg. CVC currently operates an integrated network of 24 offices throughout Europe, the U.S., and Asia.

32. Upon information and belief, CVC SICAV-FIS is the parent entity that wholly owns CVC (U.S.), its subsidiary.

33. During all relevant times, Defendant CVC SICAV-FIS was Ms. Lee's employer within the meaning of all applicable statutes.

34. Upon information and belief, at all times pertinent hereto, Defendant CVC SICAV-FIS employed hundreds of individuals worldwide.

35. Defendants CVC (U.S.), CVC Advisory (U.S.), and CVC SICAV-FIS maintained control, oversight, and direction over the operation of CVC facilities, including its employment practices in its New York office.

36. Upon information and belief, CVC maintains a "CVC Group Board" to oversee the CVC entities, their subsidiaries, and their funds. The three Co-Chairmen are Co-Founder Donald Mackenzie, Co-Founder Rolly van Rappard, and Co-Founder Steve Koltes. Among the

members of the CVC Group Board is the Firm's Head of North America, Managing Partner Christopher Stadler.

## FACTUAL ALLEGATIONS

37. Ms. Lee began working at the CVC (U.S.) office in Manhattan in October 2009 as a Director of Investor Relations, a partnership-track position covering North American accounts. She joined CVC after a successful career in investment banking and private equity fundraising at Merrill Lynch and Goldman Sachs. Ms. Lee began her career as a management consultant for AT Kearney before attending Harvard Business School.

38. Ms. Lee quickly established herself at CVC, cultivating new contacts and raising North American funds for CVC. During her tenure, she raised approximately $1.5 billion in new commitments from new relationships for CVC's funds, in addition to securing re-commitments of approximately $5 billion from investors with whom she improved relationships, and winning back clients that CVC had previously lost. Many of Ms. Lee's existing investors reinvested in CVC's new funds.

39. In January 2012, Ms. Lee was promoted to Managing Director, her only promotion while at the Firm. From that time until the termination of her employment in February 2015, she was the only female business-side Managing Director in CVC's Private Equity business in North America.

40. As a Managing Director, Ms. Lee's total compensation was comprised of salary, a performance bonus, a fundraising bonus that was tied to the funds raised for CVC each year, as well as deferred compensation in the form of shares, dividends, and the ability to invest in CVC funds.

**Defendants Maintained an Environment that Was Discriminatory to Women**

41. Male supervisors and coworkers at CVC demeaned, undermined, and sexually harassed women with impunity.

42. At CVC holiday parties and off-site events, senior-level male supervisors created a sexually hostile work environment by making comments objectifying women and subjecting women to unwanted sexual touching.

43. For instance, at a December 2010 CVC holiday celebration at a dance club, Mr. Stadler, the Firm's Head of North America, grabbed and embraced Ms. Lee and at least two other CVC female employees, forcing them to dance with him in a physically inappropriate manner and fondling their rear ends. This behavior was witnessed by other CVC employees, but Mr. Stadler was not disciplined for his behavior. After that incident, Ms. Lee avoided attending any other CVC (U.S.) events at dance clubs.

44. Thereafter, at an October 2011 CVC off-site party, Mr. Stadler kissed a female support staff member, and upon information and belief, his behavior was widely witnessed and reported internally. Nevertheless, Mr. Stadler was not disciplined and he continues in his position as CVC Managing Partner and Head of North America.

45. Upon information and belief, in the spring of 2013 Mr. Mackenzie, CVC Co-Founder and Co-Chairman, requested that "girls" (i.e., female escorts or prostitutes) be arranged for a Firm off-site in Miami.

46. Senior leadership typically excluded women from CVC off-site meetings where crucial business planning and mentorship occur by virtue of drawing the line of senior attendance at Senior Managing Directors and up. When a recently hired male Senior Managing Director asked why women were excluded from these events, he was told that it was to avoid complaints about sex harassment.

**<u>CVC Discriminated Against Ms. Lee and Denied Her Promotions for Which She was Qualified Because of Her Gender</u>**

47. Despite Ms. Lee's stellar credentials, strong relationships with investors, and fundraising track record, as evidenced by all of her performance reviews, her male supervisors and colleagues at CVC disparaged her experience and knowledge. Furthermore, as discussed below, CVC treated Ms. Lee unfairly regarding the promotions for which she was qualified.

48. When Ms. Lee began at CVC, she was supervised by Mark St. John, a CVC Partner and Head of Investor Relations based in London.

49. In October 2012, CVC hired Robert Squire, approximately 32 years old, as Senior Managing Director, Investor Relations. Ms. Lee had substantially more and deeper relevant client relationships than Mr. Squire, as well as more years of experience in private equity and finance. Nevertheless, CVC did not consider her for the position or even post the opening internally before hand-selecting Mr. Squire.

50. In the role of Senior Managing Director, Investor Relations, Mr. Squire was to supervise Ms. Lee and approximately three other Senior Managing Directors and Managing Directors worldwide. Mr. Squire's job was to manage the processes around Investor Relations and fundraising in Europe and North America and improve communications throughout the team.

51. In June 2012, Ms. Lee advised her CVC supervisors and coworkers that she was pregnant with twins and that her due date was in November 2012.

52. Prior to CVC announcing its appointment of Mr. Squire to the Senior Managing Director, Investor Relations position, Mr. St. John made remarks to Ms. Lee questioning her commitment to the Firm.

53. During annual meeting events in London in September 2012 and during CVC LP Day in New York in November 2012, Mr. St. John repeatedly made comments to Ms. Lee, casting doubt on her future productivity once she became a mother. On multiple occasions, Mr. St. John made comments to Ms. Lee to the effect of, "You just don't know how you are going to feel [after birth and maternity leave] and if you will want to come back" to CVC after the maternity leave, implying that she would not return.

54. Each time, Ms. Lee replied that Mr. St. John was mistaken and that she did not intend to make any changes to her work ethic or schedule as a result of her taking maternity leave.

55. Ms. Lee worked until the day she gave birth, November 24, 2012. After giving birth, Ms. Lee continued to check her e-mail and participate in calls throughout her leave in order to maintain her accounts.

56. On December 3, 2012, nine days after Ms. Lee gave birth, CVC attempted to reassign Ms. Lee's accounts to Mr. Squire and Mr. St. John.

57. Under that arrangement, which CVC only announced after Ms. Lee's maternity leave commenced, the Firm would reassign a meaningful portion of her key accounts, and would relegate to Ms. Lee to secondary coverage for nearly half of the remaining accounts. Mr. Squire had never discussed any such arrangement with Ms. Lee prior to her leave. Moreover, because her compensation was related, in part, to her success in fundraising, CVC's removal of these accounts would have deprived Ms. Lee professionally and financially, while enriching Mr. Squire and Mr. St. John.

58. Ms. Lee was distressed to receive the e-mail and immediately contacted Mr. Stadler, Head of North America, to ask if CVC was sending her "a message." She also told Mr. Stadler that reassigning her accounts was an inappropriate move by Mr. Squire.

59. On December 11, 2012, Mr. Squire phoned Ms. Lee and angrily told her that he could "not believe you fucking went over my head" to complain about his attempt to take her accounts. At the time, Ms. Lee was still on her first month of maternity leave.

60. CVC appeared to permit Ms. Lee to keep her accounts. In practice, however, for the few institutions where Mr. Squire had personal contacts, he reached out and called these investors without coordinating with Ms. Lee even for accounts that she officially covered. Mr. Squire continued to do this for the remainder of Ms. Lee's tenure at CVC.

61. In February 2013, Ms. Lee returned from maternity leave and experienced increased hostility at the Firm, particularly from her supervisors. Her professional opinions were not taken into consideration and Mr. Squire used his supervisory authority to ignore her suggestions.

62. Moreover, during Ms. Lee's last full year of employment at CVC, Mr. St. John aggressively cut women off while they were in the middle of speaking, including Ms. Lee. On several occasions, Mr. St. John openly yelled at Ms. Lee in public settings in front of peers and supervisors.

63. In March 2013, Ms. Lee asked Mr. St. John to intervene in Mr. Squire's conduct toward her. Upon information and belief, Mr. St. John took no remedial action.

64. After she returned from maternity leave, Mr. Squire and Mr. St. John continued to suggest that Ms. Lee was not as committed to her job now that she had children, stating that she might not want to work as much or travel now that she had young children at home. Perplexed

by the Firm's persistence in wrongfully assuming that she would not return at the same level after leave, Ms. Lee pointed out to Mr. St John and Mr. Squire that she had never said she wanted to change her lifestyle or that she did not want to travel after her leave. She noted that she fully intended to return to her same role after leave. Ms. Lee also said to Mr. Squire and Mr. St. John, "Nobody says that to men. Nobody assumes that about men."

65. In October or November 2013, Ms. Lee spoke with Mr. Koltes, CVC's Co-Founder and Co-Chairman, about changes in the team's structure. Mr. Koltes encouraged Ms. Lee to "be a doll" when interacting with Mr. Squire and others on her team.

66. By mid-2013, Ms. Lee had led fundraising for a CVC fund that exceeded the Firm's expectations both in terms of the amounts raised and timeframe. Through this contribution and others she made to the Firm, Ms. Lee was qualified to be promoted to Senior Managing Director that year. CVC failed to do so, however.

67. By the end of 2013, five women in Private Equity roles had left CVC. Before they resigned, two of these female investment professionals approached Ms. Lee to confide in her that CVC had removed them from major projects in favor of giving the roles to their male colleagues. Because CVC did nothing to address their concerns, both women ultimately left CVC.

68. In January 2015, CVC implemented "structural changes" to the Firm, resulting in Mr. Squire overseeing the Capital Markets Division and Jay Bryant serving as Head of the Sales Division. In addition, Mr. Koltes informed Ms. Lee that Mr. Squire also was slated to become co-head of North American/European Sales. Even though Ms. Lee has stronger qualifications to be co-head of North American/European Sales, the Firm did not consider her for the role.

69. When Ms. Lee asked why she was not considered for the role, Mr. Koltes claimed that some within CVC felt that she had a "problem with communication," which was untrue and

contradictory to prior performance reviews. Ms. Lee responded that communication is a two-way street and that she was fully confident that she had been collaborative, transparent, and professional in ways in which her male colleagues had not reciprocated.

70. CVC's discrimination against female employees had an adverse on impact Ms. Lee's formal and informal performance evaluations as compared to her male counterparts.

71. Upon information and belief, CVC discriminatorily paid Ms. Lee less than similarly situated male peers during her tenure at the Firm.

72. At all times relevant to this action, Defendants fostered an environment that disfavors female employees and engaged in discriminatory procedures in selecting individuals for promotion. CVC promotes an overwhelmingly disproportionate number of men, passing over equally or more qualified women.

73. At the time CVC terminated her employment, out of approximately 24 Managing Directors and 13 Senior Managing Directors in its Private Equity divisions globally, Ms. Lee was the only female business-side Managing Director.

74. After CVC terminated Ms. Lee's employment, CVC did not have any female business-side Managing Directors anywhere within Private Equity worldwide.

75. The resulting underrepresentation of women at the highest ranks of management is even more stark. Of the approximately 17 Managing Partners, 24 Partners, and 13 Senior Managing Directors who currently run CVC's Private Equity divisions globally – there are no women.

**CVC Terminated Ms. Lee's Employment as Further Discrimination and in Retaliation for Her Complaints**

76. Throughout 2014, Ms. Lee became more vocal about criticizing the sexist environment at CVC generally and Mr. Squire's discriminatory behaviors in particular, but her complaints were met with increasing hostility.

77. In addition to reporting Mr. St. John's and Mr. Squire's attempt to take away her accounts during her maternity leave, Ms. Lee reported subsequent sex-based discrimination at the highest levels within CVC.

78. In February 2014, Ms. Lee spoke to Steve Koltes, CVC Co-Founder and Co-Chairman, and discussed the problems with the male-dominated culture at CVC and obstacles women faced in trying to advance within the Firm. Mr. Koltes replied that he was skeptical that she and other female employees faced any discrimination, and said that in order to succeed, one just "had to be the best."

79. Ms. Lee's male supervisors personally confronted her because she made formal complaints of discrimination within the Firm, including complaints of discriminatory conduct by these same men. At all times, however, Ms. Lee maintained a professional demeanor.

80. In February 2014, Mr. St. John yelled at Ms. Lee in the presence of Mr. Koltes, telling her that she was "very aggressive and rude now."

81. In May 2014, Mr. Squire confronted Ms. Lee and demanded that she stop telling others that he was sexist.

82. In May or June 2014, in a conversation with Helene Thomas, a CVC Human Resources professional in London, Ms. Lee continued to discuss the environment and challenges she faced as a woman working at CVC. Ms. Lee reported her concerns to Ms. Thomas, a

London-based CVC employee, because CVC's New York office had no personnel who handled complaints of discrimination.

83. Seeing Ms. Lee's distress, Ms. Thomas suggested that Ms. Lee take several weeks' leave to "take a break." Ms. Thomas obtained permission from CVC Managing Partner and Chief Operating Officer Fred Watt and Mr. Koltes for Ms. Lee to do so. Ms. Lee declined to take a leave, however, believing that it would negatively impact her employment if she did so.

84. In October 2014, Ms. Lee approached Ms. Thomas again and complained that CVC's work environment was challenging for women because of the men on the team led by Mr. Squire and Mr. S John. But Ms. Thomas simply replied that Ms. Lee was going to have to "make it work."

85. By the end of 2014, it was well known by CVC European and New York management that Ms. Lee had complained about the gender discrimination that she and other women faced.

86. Rather than address the discrimination, CVC retaliated against Ms. Lee by terminating her employment and denying her valuable deferred compensation.

87. On January 19, 2015, Ms. Lee wrote an e-mail to CVC, expressing concern that she was not even considered for the Head of North American/European Sales position despite her clear qualifications and complaining that, "As a woman I don't feel I have had the same opportunities as men have had" at CVC. The next day, CVC informed Ms. Lee that her employment was "not working out," and commenced termination of her employment.

88. During that time, the Firm terminated the employment of another employee, who was also of Asian descent.

89. The Firm terminated Ms. Lee's employment on February 23, 2015.

90. As a result of CVC's retaliatory termination of her employment, Ms. Lee involuntarily forfeited over $10 million in equity compensation, deferred compensation, and commissions.

91. The stress from the years of discrimination and the termination of her career at CVC has had a physical and emotional toll on Ms. Lee. The stress has exacerbated her rheumatoid arthritis, caused her difficulty sleeping and excess weight loss and weight gain, and resulted in emotional distress and other damage to her health.

**CVC Unlawfully Declared Ms. Lee's Investment Shares Forfeited, in Breach of the Shareholder Agreement**

92. As remuneration for her work as an employee, CVC granted Ms. Lee the right to invest in shares of CVC through CVC Nominees Limited as a shareholder and Ms. Lee became party to the CVC Shareholder Agreement (entitled "Shareholder's Deed") dated March 26, 2008 ("Shareholder Agreement").

93. The Shareholder Agreement contains a non-compete agreement in Clause 17.1, which states, in pertinent part: "Each Shareholder agrees that before he becomes a Leaver and during the two year period commencing on his Leaver Date, he shall not . . . Behave Competitively."

94. Pursuant to the Shareholder Agreement, a former employee who breaches the non-compete provision must forfeit substantial value of their vested and unvested shares to CVC.

95. In June 2015, after CVC had terminated Ms. Lee's employment, Ms. Lee began work as a Managing Director at another financial services firm in a capacity that is not competitive with CVC.

96. Nevertheless, on July 9, 2015, CVC notified Ms. Lee that it deemed her new employment as "Behaving Competitively" and that it considered her to be a "Bad Leaver." CVC subsequently declared Ms. Lee's shares forfeited.

97. In light of the manner in which CVC terminated Ms. Lee's employment, however, the non-compete obligation is not enforceable. CVC terminated her employment involuntarily and without cause, and did not give Ms. Lee the choice to remain employed.

98. By declaring Ms. Lee's shares forfeited, CVC unlawfully deprived Ms. Lee of the value of her investments in breach of the Shareholder Agreement and related documents.

99. Ms. Lee's shares constituted wages under NYLL § 190(1). By denying Ms. Lee the value of her shares after July 2015, CVC made unlawful deductions from her wages in violation of the NYLL.

100. Defendants' actions have caused and continue to cause Ms. Lee substantial losses in earnings and other employment benefits.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Discrimination Because of Sex)**
**(New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*)**
**(Against All Defendants)**

101. Ms. Lee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

102. The New York City Human Rights Law ("NYCHRL") prohibits any employer from discriminating against an employee in the terms and conditions of her employment on the basis of sex.

103. Defendants violated the NYCHRL when they intentionally discriminated against Ms. Lee in the following terms and conditions of her employment:

a. Subjecting Ms. Lee to a hostile work environment;

b. Removing business opportunities from Ms. Lee because of her gender;

c. Denying promotions to Ms. Lee because of her gender;

d. Denying compensation opportunities to Ms. Lee because of her gender;

e. Evaluating Ms. Lee more negatively because of her gender;

f. Stereotyping Ms. Lee based upon her caregiver status; and

g. Terminating Ms. Lee's employment.

104. As a direct result of Defendants' discriminatory acts, Ms. Lee is entitled to damages including, but not limited to past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**SECOND CLAIM FOR RELIEF**
**(Retaliation)**
**(New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.*)**
**(Against All Defendants)**

105. Ms. Lee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

106. The NYCHRL prohibits any employer from retaliating against any employee who has engaged in any activity protected by the statute.

107. Ms. Lee engaged in protected activities including making internal complaints of regarding CVC's discriminatory practices against her and other female employees.

108. Defendants took adverse actions against Ms. Lee with the purpose of retaliating against her because of her participation in protected activities, causing Ms. Lee to suffer damages as a result of that conduct.

109. CVC knew that its actions constituted unlawful discrimination and showed willful and/or reckless disregard for Ms. Lee's statutorily protected rights.

110. Ms. Lee is entitled to damages including, but not limited to past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**THIRD CLAIM FOR RELIEF**
**(Retaliation for the Exercise of FMLA Rights)**
**(Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*)**
**(Against All Defendants)**

111. Ms. Lee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

112. Ms. Lee put Defendants on notice of her need for leave under the Family and Medical Leave Act, for which she was qualified, when she notified Defendants in June 2012 that she was pregnant and required FMLA leave to care for her newborn children.

113. Defendants violated the Family and Medical Leave Act when they altered the terms and conditions of Ms. Lee's employment through Mr. St. John's and Mr. Squire's harassment of Ms. Lee and attempted to take away valuable accounts in retaliation for Ms. Lee's exercise of her FMLA rights.

114. Defendants' violations of the Family and Medical Leave Act, as described in the Complaint, were willful and intentional. Defendants did not make a good-faith effort to comply with the FMLA with respect to Ms. Lee.

115. Ms. Lee is entitled to damages as a result of Defendants' unlawful acts, including past and future lost wages and benefits, liquidated damages, and reasonable attorneys' fees and costs of this action.

**FOURTH CLAIM FOR RELIEF**
**(Interference with FMLA Rights)**
**(Family and Medical Leave Act, 29 U.S.C. §2601 *et seq.*)**
**(Against All Defendants)**

116. Ms. Lee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

117. Defendants violated the Family and Medical Leave Act when they interfered with the exercise of Ms. Lee's rights under the FMLA by making comments that discouraged her from exercising her right to take FMLA leave.

118. Defendants further interfered with Ms. Lee's rights under the Family and Medical Leave Act by attempting to strip her of her accounts during her medical leave.

119. Defendants' violations of the Family and Medical Leave Act, as described in this Complaint, were willful and intentional. Defendants did not make a good-faith effort to comply with the FMLA with respect to Ms. Lee.

120. Ms. Lee is entitled to damages as a result of Defendants' unlawful acts, including past and future lost wages and benefits, liquidated damages, and reasonable attorneys' fees and costs of this action.

**FIFTH CLAIM FOR RELIEF**
**(Breach of Contract)**
**(Against All Defendants)**

121. Ms. Lee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

122. Ms. Lee and Defendants entered into valid contracts through the Shareholder Agreement and related agreements, whereby Ms. Lee would receive substantial compensation through her investment in shares of CVC in exchange for her employment with CVC.

123. Defendants materially breached the contracts by denying Ms. Lee the full benefits of her investments in CVC and unlawfully forfeiting Ms. Lee's shares.

124. Defendants' actions have caused Ms. Lee severe economic damages.

**SIXTH CLAIM FOR RELIEF**
**(NYLL Unlawful Deductions from Wages)**
**(New York Labor Law, Article 6, § 190 *et seq.*)**
**(Against All Defendants)**

125. Ms. Lee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

126. Defendants made unlawful and unauthorized deductions from Ms. Lee's earned wages by denying her the full and true value of her investment in CVC shares pursuant to the Shareholder Agreement and related agreements in violation of the NYLL, Article 6, § 193.

127. Defendants acted intentionally, willfully, and not in good faith by failing to pay Ms. Lee these earned wages in violation of the NYLL, Article 6, § 190 *et seq.*, and the supporting New York State Department of Labor Regulations.

128. Due to Defendants' violations of the NYLL, Ms. Lee is entitled to recover from Defendants the amounts of any unlawful wages, liquidated damages, reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A. Declaring that the acts, practices, and omissions complained of herein are unlawful and violate the NYCHRL, the FMLA, the NYLL, and state contract law;

B. Directing Defendants to pay Ms. Lee her back pay, front pay, equity awards, compensatory damages, liquidated damages, and pre-judgment interest for violations of the FMLA;

C. Directing Defendants to pay Ms. Lee her back pay, front pay, equity awards, compensatory damages, and pre-judgment interest for violations of the NYCHRL;

D. Directing Defendants to reinstate Ms. Lee's unlawfully forfeited equity;

E. Directing Defendants to pay Ms. Lee unpaid wages, liquidated damages, and pre-judgment and post-judgment interest pursuant to N.Y. Labor Law § 663(1);

F. Directing Defendants to pay exemplary and punitive damages commensurate with Defendants' ability to pay and sufficient to punish and deter continuation of Defendants' discriminatory and unlawful employment practices;

G. Awarding Ms. Lee reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 2617(a)(3), N.Y.C. Admin. Code § 8-502, and N.Y. Labor Law § 663(1); and

H. Awarding such other legal and equitable relief as this Court deems necessary, just and proper.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Ms. Lee demands a trial by jury on all questions of fact raised by the complaint

Dated: New York, New York
January 15, 2016

Respectfully submitted,

/s/
Cara E. Greene

**OUTTEN & GOLDEN LLP**
Cara E. Greene

Kathleen Peratis
Shirley Lin
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000
Facsimile: (646) 509-2071

*Attorneys for Plaintiff*